[Cite as *State v. White*, 2017-Ohio-1488.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,            CASE NO. 13-16-21

      v.

JAMES E. WHITE,                  O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 16-CR-0082

**Judgment Affirmed**

**Date of Decision:   April 24, 2017**

APPEARANCES:

    *Jennifer L. Kahler* **for Appellant**

    *Derek W. DeVine and Rebeka Beresh* **for Appellee**

**PRESTON, P.J.**

{¶1} Defendant-appellant, James E. White ("White"), appeals the August 23, 2016 judgment entry of sentence of the Seneca County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case stems from allegations that White sexually abused (1) his granddaughter, K.W., in 2007 and 2008, when K.W. was less than 10 years of age, (2) his daughter, C.C., between 1995 and 1996, when C.C. was 12 or 13 years old, and (3) two girls that White and his wife, Linda White ("Linda"), babysat, A.M. and K.M. (*See* Doc. No. 1); (Aug. 9, 2016 Tr., Vol. I, at 150). It was alleged that White sexually abused A.M. between 2001 and 2005, while A.M. was less than 10 years of age, and that White sexually abused K.M. between 2000 and 2002, while K.M. was less than 13 years of age. (*See* Doc. Nos. 1, 24, 25).

{¶3} On April 27, 2016, the Seneca County Grand Jury indicted White on: Counts One, Two, and Three of rape in violation of R.C. 2907.02(A)(1)(b), (B), first-degree felonies; Counts Four and Five of gross sexual imposition in violation of R.C. 2907.05(A)(4), (C)(2), third-degree felonies; and Count Six of gross sexual imposition in violation of R.C. 2907.05(A)(1), (C)(1), a fourth-degree felony. (Doc. No. 1). Counts One, Two, and Three included the specification that the victim was "less than ten years of age at the time of the offense." (*Id.*). White pled not guilty to the counts and specifications of the indictment on May 3, 2016. (Doc. No. 7).

{¶4} On July 27, 2016, the State filed a motion to amend Count Three of the indictment to reflect that White's conduct allegedly occurred between 2001 and 2005 instead of between 2001 and 2006, which the trial court granted on July 28, 2016. (Doc. Nos. 24, 25).

{¶5} The case proceeded to a jury trial on August 9 and 10, 2016. (Aug. 9, 2016 Tr., Vol. I, at 1); (Aug. 10, 2016, Vol. II, at 192). On August 10, 2016, the jury found White guilty of all of the counts and specifications of the amended indictment. (Aug. 10, 2016 Tr., Vol. II, at 309-311); (Doc. No. 33). The trial court filed its judgment entry of conviction on August 11, 2016. (Doc. No. 34).

{¶6} The trial court held a sentencing and a sex-offender registration hearing on August 19, 2016. (Aug. 19, 2016 Tr. at 2, 17, 20). The trial court sentenced White to: life in prison without the possibility of parole as to Counts One and Two, respectively; 25 years in prison as to Count Three; 54 months in prison as to Counts Four and Five, respectively; and 17 months in prison as to Count Six. (*Id.* at 16-18); (Doc. No. 36). The trial court ordered:

> Counts One and Two are ordered to be served concurrently one with the other but consecutively to each count. Counts Three and Four are ordered to be served concurrently one with the other but consecutively to each count. Count Five is ordered to be served consecutively to

each count, and Count Six is ordered to be served consecutively to each count in this case.

(*Id.* at 17-18); (*Id.*). The trial court also classified White as a Tier III sex offender. (Aug. 19, 2016 Tr. at 17, 20). The trial court filed its judgment entries of sentence and sex-offender classification on August 23, 2016. (Doc. Nos. 36, 39).[1]

{¶7} White filed a notice of appeal on August 29, 2016. (Doc. No. 41). He raises 12 assignments of error for our review, which we discuss together.

**Assignment of Error No. I**

**The Trial Court Erred in Finding Appellant Guilty of Rape of KW Where the State Failed to Introduce Sufficient Evidence to Support the Conviction.**

**Assignment of Error No. II**

**The Trial Court Erred in Finding Appellant Guilty of Rape of KW Where the State Failed to Introduce Sufficient Evidence to Support the Conviction.**

**Assignment of Error No. III**

**The Trial Court Erred in Finding Appellant Guilty of Rape of AM Where the State Failed to Introduce Sufficient Evidence to Support the Conviction.**

**Assignment of Error No. IV**

**The Trial Court Erred in Finding Appellant Guilty of Gross Sexual Imposition of AM Where the State Failed to Introduce Sufficient Evidence to Support the Conviction.**

---

[1] The trial court filed a nunc pro tunc judgment entry of sentence on September 9, 2016.

## Assignment of Error No. V

**The Trial Court Erred in Finding Appellant Guilty of Gross Sexual Imposition of KM Where the State Failed to Introduce Sufficient Evidence to Support the Conviction.**

## Assignment of Error No. VI

**The Trial Court Erred in Finding Appellant Guilty of Gross Sexual Imposition of CC Where the State Failed to Introduce Sufficient Evidence to Support the Conviction.**

## Assignment of Error No. VII

**The Trial Court Erred in Finding Appellant Guilty of Rape of KW When the Conviction Was Against the Manifest Weight of the Evidence.**

## Assignment of Error No. VIII

**The Trial Court Erred in Finding Appellant Guilty of Rape of KW When the Conviction Was Against the Manifest Weight of the Evidence.**

## Assignment of Error No. IX

**The Trial Court Erred in Finding Appellant Guilty of Rape of AM When the Conviction Was Against the Manifest Weight of the Evidence.**

## Assignment of Error No. X

**The Trial Court Erred in Finding Appellant Guilty of Gross Sexual Imposition of AM When the Conviction Was Against the Manifest Weight of the Evidence.**

**Assignment of Error No. XI**

**The Trial Court Erred in Finding Appellant Guilty of Gross Sexual Imposition of KM When the Conviction Was Against the Manifest Weight of the Evidence.**

**Assignment of Error No. XII**

**The Trial Court Erred in Finding Appellant Guilty of Gross Sexual Imposition of CC When the Conviction Was Against the Manifest Weight of the Evidence.**

{¶8} In his 12 assignments of error, White argues that his convictions are based on insufficient evidence and are against the manifest weight of the evidence.[2] In particular, he argues in his first, second, and third assignments of error that there is insufficient evidence that he raped K.W and A.M. He specifically argues under his fourth, fifth, and sixth assignments of error that there is insufficient evidence to find him guilty of gross sexual imposition. In his seventh, eighth, and ninth assignments of error, he argues that rape convictions are against the manifest weight of the evidence. Finally, in his tenth, eleventh, and twelfth assignments of error, he argues that his gross-sexual-imposition convictions are against the manifest weight of the evidence.

{¶9} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). As such, we address each legal concept individually.

---

[2] White does not challenge the specifications that the victims were less than ten years of age at the time of the offenses.

**{¶10}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

**{¶11}** On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier

of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶12} White was convicted of three counts of rape in violation of R.C. 2907.02(A)(1)(b), two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), and one count of gross sexual imposition in violation of R.C. 2907.05(A)(1). The offense of rape is codified under R.C. 2907.02, which provides, in pertinent part:

> (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
>
> * * *

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

R.C. 2907.02(A)(1)(b). "In order to prove rape under R.C. 2907.02(A)(1)(b), the State must prove the offender engaged in *sexual conduct* with a person[, not the offender's spouse, and that the conduct was with a person] less than thirteen years of age, whether or not the offender knew the age of the other person." (Emphasis added.) *State v. Jones*, 2d Dist. Montgomery No. 26289, 2015-Ohio-4116, ¶ 42. "'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another[.]" R.C. 2907.01(A).

{¶13} R.C. 2907.05 sets forth the offense of gross sexual imposition and provides, in relevant part:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.

\* \* \*

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

R.C. 2907.05(A)(1), (4). "In order to prove the offense of gross sexual imposition [under R.C. 2907.05(A)(4)], 'the State must prove that the defendant had sexual contact with a person, not the defendant's spouse, and that the contact was with a person under the age of thirteen, whether the defendant knew the age of the person or not.'" *Jones* at ¶ 43, quoting *State v. Israel*, 2d Dist. Miami No. 09-CA-47, 2010-Ohio-5044, ¶ 25. To prove the offense of gross sexual imposition under R.C. 2907.05(A)(1), the State must prove that the defendant had sexual contact with a person, not the defendant's spouse, and that the defendant purposely compelled the victim to submit to the sexual contact by force or threat of force. *See State v. Wine*, 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, ¶ 39-40.

{¶14} "The term 'sexual contact' is defined as 'any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.'" *Jones* at ¶ 43, quoting R.C. 2907.01(B). "'"[T]here is no requirement that there be direct testimony regarding sexual arousal or gratification."'" *Id.*, quoting *State v. Clark*, 2d Dist. Clark No. 2013 CA 52, 2014-Ohio-855, ¶ 12, quoting *State v. Gesell*, 12th Dist. Butler No. CA2005-08-367,

2006-Ohio-3621, ¶ 25. "The trier of fact may infer from the evidence presented at trial whether the purpose of the touching was for the defendant's sexual arousal or gratification." *Id.*, citing *Clark* at ¶ 12.

{¶15} At trial, the State offered the testimony of six witnesses. As its first witness, the State called April Winget ("Winget") who testified that White is her father and that, prior to 2008, her family saw White "every day." (Aug. 9, 2016 Tr. at 121, 123). According to Winget, in 2008, her daughter, K.W., alleged that White "exposed his penis to her." (*Id.* at 124). However, K.W. did not allege that White raped her when she shared with her mother that White exposed his penis to her. (*Id.* at 124-125). After K.W.'s revelation, Winget's family did not have contact with White. (*Id.* at 125). In January 2016, K.W. revealed to Winget additional allegations regarding White, which caused Winget to contact "social services." (*Id.* at 125-126).

{¶16} As its second witness, the State offered the testimony of K.W., age 14, who testified that White is her grandfather. (*Id.* at 133, 135). She testified that she was born in January 2002. (*Id.* at 134). K.W. testified that White and Linda would babysit her and that sometimes she would spend the night at their home. (*Id.* at 135-137). K.W. described a typical night that she spent with her grandparents:

> I stayed there, put my bags up, stay in the room, sleep, wake up. I'd
>
> go out in the living room. Grandma would send me in when grandpa

was ready for me to go in the bedroom * * * sometimes [alone], but after a little while she would send my sister in.

(*Id.* at 137). She testified that she would get into bed with White and "[h]e would put his fingers down in my vagina and touch my vagina and sometimes he'd put his fingers in my butt." (*Id.*). She testified that she was sent to her grandfather's bedroom "[e]very time [she] was there in the morning." (*Id.*). She recalled that she began being sent to her grandfather's bedroom when she was "five, six, seven" and that it stopped when she was seven. (*Id.* at 138).

{¶17} She testified that she divulged in 2008 that White exposed his penis to her. (*Id.* at 139). However, she did not reveal "that more had happened" until she was 14 years old because she "felt strongly that [she] needed to tell" her mother at that time since she "was having bad dreams and [her mother] needed to know because [she] needed help sleeping. (*Id.* at 139-140). According to K.W., she did not reveal what her grandfather had done to her prior to that day because she "was scared." (*Id.* at 140). She did not "mention that more had happened" when she revealed that White exposed his penis to her,

[b]ecause everybody was freaking out and I'm just, like, oh, I don't want to freak out anybody else, and I was scared and I was young and everything was all confusing, and I didn't want to say anything because I was scared I could get yelled at.

(*Id.* at 143). According to K.W., she disclosed that White exposed his penis to her because she "accidentally walked in on [her] dad one time in the bathroom and [her] mom and dad had given [her] a very serious talk that it was bad for a girl to see a man's penis, and when he showed it to me that's how I knew that this was wrong." (*Id.*). She testified that she does not know A.M. or K.M. (*Id.* at 140).

{¶18} On re-cross examination, K.W. testified that her grandmother sent her into White's bedroom to wake him up. (*Id.* at 144).

{¶19} C.C., age 33, testified as the State's third witness. (*Id.* at 144). She testified that she was born in June 1983. (*Id.* at 147). C.C. testified that White is her biological father and that Winget is her sister. (*Id.* at 146, 153). She testified that she has a relationship with Winget and K.W., but testified that she does not know A.M. or K.M. (*Id.* at 154-555).

> C.C. testified that, when she was 12 or 13 years old, White had his thumb under [her] shirt and just started rubbing [her] skin, and then he just gradually started making his way up [her] shirt as he's rubbing with his thumb. And then he ended up taking his thumb and rubbing it across [her] left nipple * * * and then started working his way down into [her] pants. And when he got his -- the tip of his fingers under [her] underwear line, [she] told him [she] wanted to go to bed.

(*Id.* at 150). According to C.C., she had no other incidents with White, she reported the incident to her best friend, and, approximately a year later, she told her mother. (*Id.* at 150, 153).

**{¶20}** On cross-examination, she testified that she spoke with law enforcement after she spoke with Winget. (*Id.* at 159). On re-direct examination, C.C. testified that Winget did not tell her what to say to law enforcement. (*Id.* at 160).

**{¶21}** Next, K.M., age 26, testified on behalf of the State. (*Id.* at 161). K.M. was born in January 1990. (*Id.* at 163). She testified that White and Linda were her babysitters when she was "seven, eight all the way up to * * * 11, 12." (*Id.* at 163-164). She testified that the Whites stopped babysitting her and A.M. when K.M. was 13 or 14 years old. (*Id.* at 171). K.M. testified that she knows Winget and K.W. (*Id.*). She further testified that she has not seen Winget or K.W. since the Whites stopped babysitting her. (*Id.*).

**{¶22}** According to K.M., during one of the times that White and Linda were babysitting her when she was nine or ten, White's "hands was [sic] down [her] shirt grabbing [her] left breast." (*Id.* at 166). She recalled specific details regarding the incident, including that: (1) it occurred at 7:00 or 8:00 p.m.; (2) she had been outside playing and came inside to take a shower; (3) White was brushing her hair after her shower while she was watching television; (4) White grabbed her left breast during

a commercial for the television program she was watching; and (5) she was wearing a nightgown. (*Id.* at 166-169).

**{¶23}** Next, Detective Shawn Vallery ("Detective Vallery") of the Tiffin Police Department testified that he was contacted by Seneca County Children's Services in February 2016 to investigate K.W.'s sexual-abuse allegation against White. (*Id.* at 176-177, 180). Detective Vallery interviewed Winget and K.W. regarding K.W.'s allegations, and Winget "mentioned an episode between James White and her sister [C.C.]." (*Id.* at 181-185). Later Winget told Detective Vallery about "some concerns of two females that James and Linda White baby-sat." (Aug. 10, 2016 Tr., Vol. II, at 196). Detective Vallery also interviewed C.C., A.M., and K.M. as part of his investigation. (Aug. 9, 2016 Tr., Vol. I, at 184); (Aug. 10, 2016 Tr., Vol. II, at 198-199, 203).

**{¶24}** Detective Vallery testified that he has training and experience investigating sexual-abuse cases—namely, he testified that he has training and experience interviewing teenage girls regarding sexual abuse. (Aug. 9, 2016 Tr., Vol. I, at 178, 183). He relayed that K.W. appeared "uncomfortable" explaining what occurred with White. (*Id.* at 183-184). Detective Vallery did not "consider having [K.W.] examined medically for the collection of evidence" because "[i]t had been over eight years since the incident happened. There would have been no evidence to collect at that time." (*Id.* at 185).

{¶25} Detective Vallery identified State's Exhibit 1 as a redacted recording of his interview of White, which was subsequently played for the jury. (Aug. 9, 2016 Tr., Vol. I, at 186-189). He identified State's Exhibit 2 as a recording of his phone interview of White, which was subsequently played for the jury. (Aug. 10, 2016 Tr., Vol. II, at 204, 207).

{¶26} On cross-examination, Detective Vallery testified that White maintained his innocence throughout his investigation. (*Id.* at 211). Detective Vallery testified that he interviewed A.M. a second time but that A.M.

> didn't change anything from her first interview. She had informed [him] that there was more that she remembered as she started remembering things that she had put behind her several years ago. And she told [him] that Mr. White when they were in the bedroom that he would pull his penis out and show it to her and sometimes it would touch her face and he would make statements to her.

(*Id.* at 212-213). Detective Vallery interviewed A.M. a second time because A.M.'s boyfriend revealed to Detective Vallery that A.M. "confided in her boyfriend * * * something about oral sex between [White] and her." (*Id.* at 213). However, A.M. denied to Detective Vallery that White "had her perform oral sex on him"; rather, A.M. "did confirm that [White] did pull his penis out in front of her prior to the other sexual abuse." (*Id.* at 214).

{¶27} On re-direct examination, Detective Vallery testified that he did not have the opportunity to question White regarding A.M. and K.M.'s allegations. (*Id.* at 216). He testified that K.W., C.C., A.M., and K.M. never denied that they were sexually abused by White. (*Id.* at 217).

{¶28} A.M. testified on behalf of the State that the Whites babysat her from the time she was a "baby" until she was "[a]round 10 years old." (*Id.* at 222, 224-225). She testified that she was born in October 1994 and that K.M., her sister, is "close to five years" older than she is. (*Id.* at 223).

{¶29} A.M. testified that she "was sexually abused and molested by James White." (*Id.* at 226). She testified that the sexual abuse began after the Whites "moved to Westgate," which was when she was "about five" years old. (*Id.* at 225). She further testified that the Whites stopped babysitting for her when she was "[a]round ten years old." (*Id.*). A.M. testified that she knows Winget, K.W., and C.C. but does not have a relationship with Winget, K.W., or C.C. (*Id.* at 235-237). She further testified that she has not seen Winget, K.W., or C.C. since the Whites stopped babysitting her. (*Id.*).

A.M. recalled:

There was [sic] different altercations with him. One of the altercations was in his living room on his chair. He would always want me to sit with him, and he would always have like a red checkered blanket and

put it over us and -- when I would sit on his lap because he would

want me to, and then he would slide his -- because the blanket would

be over us, and he would slide his fingers down my pants and fondle

with my vagina.

(*Id.* at 226). According to A.M., White's finger "penetrated" her vagina for "about

five minutes." (*Id.* at 228-229). A.M. described another incident:

He asked me to go back in his bedroom, and he told me to sit on his

bed, and he would flop out his penis and put it in my face. And then

he told me to lay down, told me to pull down my pants. And he would

leave the room, and he would get a washcloth and he would come

back and lay down and he would put the washcloth over his penis and

put it in my butt area and my taint area and rub it up and down, and

then he would take the washcloth off and then do it again, and then he

would put the washcloth back on and do it.

(*Id.* at 230). According to A.M., this "rubbing activity" lasted for approximately 15

minutes. (*Id.*). A.M. did not tell anyone about these incidents because she "was

scared what was gonna [sic] happen to [her] or to them or to anybody." (*Id.* at 231).

She eventually confided in her sister, and then her friends when she was "about 12,

13 years old." (*Id.* at 231-232). When asked whether she could "be certain that"

"the abuse [she] described" "occurred the way [she] testified" to since it "happened

-18-

a long time ago," A.M. responded that she was certain "[b]ecause it traumatized [her]. [She will] never forget it." (*Id.* at 237).

**{¶30}** On cross-examination, A.M. confirmed that the sexual abuse occurred from when she was six years old until she was ten years old. (*Id.* at 237-238). She testified that she revealed additional details regarding the abuse in her second interview with Detective Vallery because she "blocked it out" but remembered the additional details later. (*Id.* at 242).

**{¶31}** On re-direct examination, A.M. described an incident in which she locked herself in a bathroom so that she would not be left alone with White. (*Id.* at 244-245).

**{¶32}** Thereafter, the State moved to admit its exhibits and rested. (*Id.* at 247-248). State's Exhibit 1 was admitted without objection, and State's Exhibit 2 was admitted over the defense's objection. (*Id.*). Next, White made a Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 248-252). White did not provide any evidence and rested. (*Id.* at 252-253). White did not renew his Crim.R. 29(A) motion. The case was submitted to the jury, which found White guilty as to the counts and specifications of the amended indictment. (*Id.* at 309-311).

**{¶33}** As an initial matter, we must address White's failure to renew his Crim.R. 29(A) motion at the conclusion of his case-in-chief or at the conclusion of all the evidence.

> In order to preserve the issue of sufficiency on appeal, this court has held that "[w]hen a defendant moves for acquittal at the close of the state's evidence and that motion is denied, the defendant waives any error which might have occurred in overruling the motion by proceeding to introduce evidence in his or her defense. In order to preserve a sufficiency of the evidence challenge on appeal once a defendant elects to present evidence on his behalf, the defendant must renew his Crim.R. 29 motion at the close of all the evidence."

*State v. Hurley*, 3d Dist. Hardin No. 6-13-02, 2014-Ohio-2716, ¶ 37, quoting *State v. Edwards*, 3d Dist. Marion No. 9-03-63, 2004-Ohio-4015, ¶ 6. Based on this court's precedent, White's failure to renew his Crim.R. 29(A) motion at the conclusion of his case-in-chief or at the conclusion of all evidence waived all but plain error on appeal. *Id.* at ¶ 37, citing *State v. Flory,* 3d Dist. Van Wert No. 15-04-18, 2005-Ohio-2251, citing *Edwards*.

{¶34} "However, '[w]hether a sufficiency of the evidence argument is reviewed under a prejudicial error standard or under a plain error standard is academic.'" *Id.* at ¶ 38, citing *Perrysburg v. Miller*, 153 Ohio App.3d 665, 2003-Ohio-4221, ¶ 57 (6th Dist.), quoting *State v. Brown,* 2d Dist. Montgomery No. 17891, 2000 WL 966161, *8 (July 14, 2000). "Regardless of the standard used, 'a conviction based on legally insufficient evidence constitutes a denial of due process,

and constitutes a manifest injustice.'" *Id.*, quoting *Thompkins,* 78 Ohio St.3d at 386-387. Accordingly, we will proceed to determine whether the State presented sufficient evidence to support White's convictions. *See id. See also State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999).

**{¶35}** First, White argues that there is insufficient evidence to convict him of raping K.W. or A.M.[3] We disagree. The State presented sufficient evidence that White raped K.W. and A.M.—namely, the State presented sufficient evidence that White inserted his finger into the vaginal and anal openings of K.W. and the vaginal opening of A.M., when K.W. and A.M. were less than thirteen years of age.

**{¶36}** There is sufficient evidence that White engaged in sexual conduct with K.W. and A.M. K.W. testified that White "put his fingers down in [her] vagina" and she testified that White "put his fingers in [her] butt." (Aug. 9, 2016 Tr., Vol. I, at 137). Similarly, A.M. testified that White "penetrated" her vagina with his finger. (Aug. 10, 2016 Tr., Vol. II, at 228). These acts constitute "sexual conduct" under R.C. 2907.01(A). "A rape victim's testimony that an offender inserted his finger inside her vagina [or anus] is sufficient evidence of penetration." *State v. Roberts*, 1st Dist. Hamilton No. C-040547, 2005-Ohio-6391, ¶ 64, citing *State v. Lucas*, 2d Dist. Montgomery No. 18644, 2001 WL 1103288, *3 (Sept. 21, 2001).

---

[3] White does not challenge the element that he is not married to the victims.

*See State v. Phillips*, 6th Dist. Lucas No. L-09-1149, 2010-Ohio-2577, ¶ 58 (concluding that Phillips's rape conviction under R.C. 2907.02(A)(1)(b) was based on sufficient evidence because "the jury could have found the element of anal penetration" based on the victim's testimony that Phillips digitally penetrated her "bottom"). *See also State v. Arcuri*, 11th Dist. Trumbull No. 2015-T-0123, 2016-Ohio-8254, ¶ 79 ("A single statement indicating that Arcuri digitally penetrated her vaginal opening is sufficient to demonstrate 'sexual conduct' for the purposes of Rape.").

**{¶37}** Nonetheless, White appears to argue that his rape convictions are based on insufficient evidence because the victims' testimony is not credible since their testimony is not corroborated by any evidence. However, "[a] victim's testimony concerning vaginal [or anal] penetration need not be corroborated." *Roberts* at ¶ 67, citing *State v. Gingell*, 7 Ohio App.3d 364, 365-366 (1st Dist.1982). Instead, the victims' testimony, if believed, is sufficient evidence to convict White of rape under R.C. 2907.02(A)(1)(b). *See State v. Westerfield*, 10th Dist. Franklin No. 07AP-1072, 2008-Ohio-4458, ¶ 35.

**{¶38}** The State also presented sufficient evidence that the sexual conduct occurred while the victims were less than thirteen years of age. K.W. testified that this occurred when she was "five, six, [or] seven" years of age. (Aug. 9, 2016 Tr., Vol. I, at 138). Moreover, K.W. testified that she was born in 2002 and that she

stopped seeing White in 2008—a time period during which she was less than thirteen years of age. A.M. testified that the sexual abuse occurred between the ages of six and ten. Likewise, A.M. testified that she is nearly five years younger than K.M. K.M. testified that the Whites stopped babysitting A.M. and K.M. when K.M. was 13 or 14 years old. As such, A.M. would have been approximately eight or nine years old when she stopped seeing White.

**{¶39}** Yet, White argues that there is insufficient evidence supporting his conviction for the rape of A.M. because she "was unable to state when [the] alleged offense occurred." (Appellant's Brief at 9). White's argument is meritless. First, "exact dates are generally not essential elements of offenses." *State v. Triplett*, 11th Dist. Ashtabula No. 2013-A-0018, 2013-Ohio-5190, ¶ 43, citing *State v. Sellards*, 17 Ohio St.3d 169, 171 (1985). Second, "Ohio courts have repeatedly held that in cases involving the sexual molestation of minor children, the state is not required to provide exact dates because the victims are simply unable to remember such facts, particularly where the repeated offenses take place over an extended period of time." *Id.* at ¶ 44, citing *State v. Lawrinson*, 49 Ohio St.3d 238, 239 (1990), *State v. Barnecut*, 44 Ohio App.3d 149 (5th Dist.1988), *State v. Daniel*, 97 Ohio App.3d 548, 556 (10th Dist.1994), and *State v. Mundy*, 99 Ohio App.3d 275, 296 (2d Dist.1994). Likewise, "'if the evidence supports a finding that the defendant was alone with the victim during the relevant time frame and the defense is that the

sexual abuse never occurred, the inability to identify a specific date does not require reversal of a conviction.'" *Arcuri* at ¶ 80, quoting *State v. Latorres*, 11th Dist. Ashtabula Nos. 2000-A-0060 and 2000-A-0062, 2001 WL 901045, *4 (Aug. 10, 2001), and citing *Triplett* at ¶ 44. Indeed, A.M. testified that White and Linda babysat her from the time she was a baby until she was ten years old, and she testified that the sexual abuse occurred from when she was six years old until she was ten years old. The evidence supports a finding that White was alone with A.M. during the timeframe that A.M. alleges that the rape occurred. *See Jones*, 2015-Ohio-4116, at ¶ 45 (noting that "Jones would sometimes babysit" the victim).

{¶40} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that White engaged in sexual conduct with K.W. and A.M., while the K.W. and A.M. were less than thirteen years of age. *Id.* at ¶ 48. Therefore, there is sufficient evidence that White committed rape under R.C. 2907.02(A)(1)(b). As such, White's first, second, and third assignments of error are overruled.

{¶41} Next, White argues that there is insufficient evidence to convict him of gross sexual imposition under R.C. 2907.05(A)(1) and (4). We will first address White's sufficiency-of-the-evidence arguments as they relate to his convictions under R.C. 2907.05(A)(4), followed by his sufficiency-of-the-evidence argument as it relates to his conviction under R.C. 2907.05(A)(1).

{¶42} The State presented sufficient evidence that White engaged in sexual contact with A.M. and K.M., while A.M. and K.M. were less than thirteen years of age. A.M. testified that White "fondled her vagina" under her clothes and "rubbed" a washcloth on her bare pubic region. (Aug. 10, 2016 Tr., Vol. II, at 226, 230). K.M. testified that White "grabb[ed her] left breast" underneath her shirt. (Aug. 9, 2016 Tr., Vol. I, at 166). These acts constitute sexual contact under R.C. 2907.01(B) because a reasonable trier of fact could infer from A.M.'s and K.M.'s testimony that the purpose of the touching was for White's sexual arousal or gratification. *See Jones* at ¶ 50.

{¶43} Further, the State presented sufficient evidence that the sexual contact occurred while A.M. and K.M. were less than thirteen years of age. As we noted above, A.M. testified that the sexual abuse occurred from when she was six years old until she was ten years old, and A.M.'s time frame was corroborated by K.M.'s testimony. K.M. testified that the sexual contact occurred when she "was nine or ten." (Aug. 9, 2016 Tr., Vol. I, at 166). However, as to A.M., White makes the same argument that he made regarding his rape conviction as to A.M.—that is, that his gross-sexual-imposition conviction under R.C. 2907.05(A)(4) is based on insufficient evidence because A.M. did not specifically identify when White abused her. For the same reason we rejected White's argument as to his rape conviction,

we reject White's argument here. *See, e.g.*, *Triplett*, 2013-Ohio-5190, at ¶ 44; *Jones* at ¶ 50; *Arcuri*, 2016-Oho-8254, at ¶ 80.

{¶44} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that White engaged in sexual contact with A.M. and K.M., while A.M. and K.M. were less than thirteen years of age. *See Jones* at ¶ 53. Therefore, there is sufficient evidence that White committed gross sexual imposition under R.C. 2907.05(A)(4).

{¶45} Finally, as to White's conviction under R.C. 2907.05(A)(1), White makes arguments relative only to whether C.C.'s testimony that White engaged in sexual contact with her is believable. As such, we will address only that element of the offense—that is, whether the State presented sufficient evidence that White engaged in sexual contact with C.C. We conclude that the State presented sufficient evidence that White engaged in sexual contact with C.C. C.C. testified that White "rubb[ed]" "his thumb" "across [her] left nipple" under her shirt. (Aug. 9, 2016 Tr., Vol. I, at 150). This conduct constitutes sexual contact under R.C. 2907.01(B) because a reasonable trier of fact could infer from C.C.'s testimony that the purpose of the touching was for White's sexual arousal. *See Jones* at ¶ 50.

{¶46} Even so, White argues that C.C.'s testimony is not credible for a number of reasons, including (1) the sexual contact "occurred over twenty years ago," (2) "C.C. made no report at the time of the incident [and] testified that in 2008,

she was aware of the allegation that [K.W.] made against [White], but she did not make any report at that time against [White]," and (3) C.C. "chose to live with [White] after this allegedly occurred." (Appellant's Brief at 12). However, we do not resolve credibility issues when resolving whether there is sufficient evidence to support a conviction. *See In re Whitlock*, 11th Dist. Ashtabula No. 2008-A-0018, 2008-Ohio-4672, ¶ 26, citing *DeHass,* 10 Oho St.2d 230, at paragraph one of the syllabus. Instead, "the believability was for the jury to decide." *See State v. Page*, 2d Dist. Montgomery No. 26670, 2017-Ohio-568, ¶ 30. C.C.'s testimony, if believed, is sufficient evidence that White engaged in sexual contact with C.C. *See id.* at ¶ 30 ("[The victim's] testimony, if believed, was sufficient to support Page's conviction of * * * gross sexual imposition."); *In re Whitlock* at ¶ 26 (rejecting the defendant's argument that his gross-sexual-imposition conviction was based on insufficient evidence because the "victim was not a credible witness").

**{¶47}** Accordingly, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that White engaged in sexual contact with C.C. Therefore, there is sufficient evidence that White committed gross sexual imposition under R.C. 2907.05(A)(1).

**{¶48}** White's fourth, fifth, and sixth assignments of error are overruled.

**{¶49}** Having concluded that White's convictions are based on sufficient evidence, we next address White's arguments that his convictions are against the

manifest weight of the evidence. *See State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 38; *Velez*, 2014-Ohio-1788, at ¶ 76. White makes the same arguments that he makes in support of his sufficiency-of-the-evidence assignments of error—namely, that K.W., A.M., K.M., and C.C. are not credible and that there is no DNA or medical evidence to corroborate K.W.'s allegations. We conclude that the evidence that we summarized in our sufficiency-of-the-evidence analysis does not heavily weigh against White's convictions.

{¶50} As with many sexual-abuse cases, this case presents the "classic 'he-said/she-said'" scenario, "with no physical evidence to corroborate the [victims'] allegation[s]." *In re N.Z.*, 11th Dist. Lake Nos. 2010-L-023, 2010-L-035, and 2010-L-041, 2011-Ohio-6845, ¶ 79. "Thus, credibility of the witnesses was the primary factor in determining guilt." *Id.* As we noted above, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *DeHass*, 10 Ohio St.2d 230 at, paragraph one of the syllabus. "When examining witness credibility, 'the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.'" *In re N.Z.* at ¶ 79, quoting *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). "A fact finder is free to believe all, some, or none of the testimony of each witness appearing before it." *Id.*, citing *State v. Thomas*, 11th Dist. Lake No. 2004-L-176, 2005-Ohio-6570, ¶ 29. *See also*

*Missler* at ¶ 44, quoting *State v. Daley*, 3d Dist. Seneca No. 13-13-26, 2014-Ohio-908, ¶ 15, quoting *State v. Antill*, 176 Ohio St. 61, 67 (1964). "'"A verdict is not against the manifest weight of the evidence because the [jury] chose to believe the State's witnesses rather than the defendant's version of the events."'" *Missler* at ¶ 44, quoting *State v. Bean*, 9th Dist. Summit No. 26852, 2014-Ohio-908, ¶ 15, quoting *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16.

{¶51} In this case, K.W., A.M., K.M., and C.C. testified to their version of events surrounding the sexual abuse that led to White's rape and gross-sexual-imposition convictions, and the jury found the victims credible. *Compare State v. Curry*, 3d Dist. Allen No. 1-15-05, 2016-Ohio-861, ¶ 66 (concluding that Curry's rape and robbery convictions were not against the manifest weight of the evidence because the trier of fact found the victim's version of events credible). Although White did not testify, the jury was able to view the video recording of his interview with Detective Vallery in which White can be heard denying K.W.'s and C.C.'s allegations and explaining his theories as to why they accused him of the sexual abuse. (State's Ex. 1). (*See also* State's Ex. 2). Indeed, White accuses his ex-wife, Winget, Winget's husband, and the victims as conspiring against him. (State's Ex. 1). White theorizes that the collusion is a ruse to exact revenge based on feuds he has with those people, or that the collusion is a ploy to obtain money from him since he recently received an inheritance from his father-in-law's estate. (*Id.*).

Nevertheless, White's theories are belied by Detective Vallery's discovery of additional victims—namely, A.M. and K.M. A.M. and K.M. testified that, while they know Winget, K.W., and C.C., they do not have a relationship with them and have not seen Winget, K.W., or C.C. since the Whites stopped babysitting them—more than 12 years ago.

**{¶52}** White also argues that the victims' allegations are not credible because they did not report the sexual abuse when it occurred; rather, they reported the abuse several years later. K.W., A.M., K.M., and C.C. explained why they did not come forward sooner with details of the sexual abuse. The jury was free to find their explanations credible. *Compare State v. Bones*, 2d Dist. Montgomery No. 26017, 2015-Ohio-784, ¶ 33-34, 40 (concluding that Bones' rape convictions were not against the manifest weight of the evidence even though the victim did not report the abuse until several years later).

**{¶53}** Moreover, White's pattern of abuse was revealed through Detective Vallery's investigation after K.W. spontaneously disclosed the abuse to her mother. *See State v. Stefka*, 7th Dist. Monroe No. 10 MO 7, 2012-Ohio-3004, ¶ 77 (rejecting Stefka's argument that his rape and gross-sexual-imposition convictions were against the manifest weight of the evidence because the victim's testimony was "unclear, uncertain and unreliable," since the victim "was the one who

spontaneously disclosed the abuse to her stepmother"). Likewise, the victims recalled many specific details about the abuse. *See Bones* at ¶ 35.

**{¶54}** Finally, that there is no DNA or medical evidence corroborating K.W.'s allegations does not weigh against White's convictions as to K.W. Indeed, "physical evidence is not required to support a rape conviction against a manifest weight challenge." *State v. Thomas*, 9th Dist. Summit No. 27580, 2015-Ohio-5247, ¶ 31, citing *State v. Martinez*, 9th Dist. Summit No. 24037, 2008-Ohio-4845, ¶ 13 (rejecting manifest weight challenge to rape conviction even though there was "'little to no credible physical evidence'"). Furthermore, Detective Vallery testified that it was unlikely that any DNA or medical evidence would be discovered considering the amount of time that passed between when the abuse occurred and when K.W. told Winget.

**{¶55}** For these reasons, White's arguments are unpersuasive. Accordingly, we cannot conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that White's convictions must be reversed and a new trial ordered.

**{¶56}** White's seventh, eighth, ninth, tenth, eleventh, and twelfth assignments of error are overruled.

Case No. 13-16-21

{¶57} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**